Robert Edgar DOBYNS,
Plaintiff-Respondent,

v.

Dao Thi DOBYNS, Defendant-Appellant.

No. WD34037.

Missouri Court of Appeals,
Western District.

April 19, 1983.

Robert L. Langdon, Bradley, Langdon & Bradley, Lexington, for defendant-appellant.

James D. Worthington, D.W. Sherman, Jr., Aull, Sherman & Worthington, Lexington, for plaintiff-respondent.

Before WASSERSTROM, P.J., and TURNAGE and CLARK, JJ.

WASSERSTROM, Presiding Judge.

This is a child custody determination made pursuant to an original petition filed by the father Robert Dobyns ("Robert"). The trial court granted custody to Robert with rights of visitation to the mother Dao Thi Dobyns ("Dao"). Dao appeals. Contrary to her contentions, we hold: (1) the Missouri trial court had jurisdiction to hold an original custody hearing and was not precluded from doing so by the divorce decree entered by a Nevada court in 1978; (2) the trial court was not required to defer to the alleged continuing jurisdiction of the Nevada court; and (3) the trial court was not required to deny jurisdiction because of the "clean hands" provisions of the Uniform Child Custody Jurisdiction Act.

The parties were married in Vietnam in 1975 and came to the United States two or three days later. They first lived with Robert's mother in Sacramento, California and then moved into their own home in that city where they continued to live until the spring of 1978. Dao had secured a job in a casino as a black jack dealer in Carson City, Nevada, and the parties, together with their young son, moved to Carson City on March 14, 1978. Robert bought a home in Carson City in joint names, moved the household furniture to the Carson City home, registered an automobile license in Nevada, and applied for a driver's license in Nevada.

A little more than a month later, a violent argument erupted between Robert and Dao. The cause of the argument and just what was said is a matter of sharp dispute. Robert testified that the quarrel ended with a demand by Dao that he and the son leave the home. Dao, on the other hand, testified that she never asked that Robert take the child away from the family home in Carson City.

Immediately following the quarrel, Robert left the home with the son and he returned to Sacramento with the child on April 20, 1978. While he was in Sacramento during this period, a number of telephone calls took place between the parties. After living in Sacramento for approximately ten

days, Robert and the son went to stay in Ohio at the home of Robert's brother. They stayed in Ohio for about two weeks and then returned to Sacramento. Robert testified that some time during this two week stay in Ohio, he made his last call to Dao because "she told me don't write to me or call me any more, because all we do is get each other upset, and I don't want to hear from you any more."

After his return to Sacramento, Robert received a telegram from a military friend, Campbell, asking him to take over management of a farm for him in Missouri. Robert agreed to do so, and he and his son went to Cedar County, Missouri, and managed Campbell's farm for 16 months. At the end of that time, Campbell notified Robert that he, Campbell, was returning from overseas and would need the farm for his own living purposes. Accordingly, Robert returned to live in Ohio.

In June 1980, Campbell again got in touch with Robert and asked him to undertake the management of a farm for Campbell near Odessa, Missouri. Robert accepted that offer and he and his son moved to Odessa on June 6, 1980. They still lived on that farm at the time of the hearing of this case.

Shortly after Robert had left the family home in Carson City, Dao filed suit for divorce on May 18, 1978, in Nevada. Service was had upon Robert by publication.

In about June 1978, Robert sent a tape recording to Dao which became the subject of much contention during the course of this trial. In this tape, Robert made a number of bitter accusations against Dao and also made a number of references to a divorce proceeding. The latter comments were in part as follows:

"The last time I talked to you you told me to contact your lawyer and try to agree on some kind of a settlement to get this thing finished.... I cannot understand why you became so impatient and went to see the lawyer so soon. Even Dai told you to wait until after he came back from Vietnam before you started to get divorced from me.... When I go to

court and fight for custody of your son, it won't be in Nevada. It will be in a state where they still believe that a man's wife is supposed to be true to him, and I will win.... I told you that if you went ahead with the divorce, then I would do whatever I had to do. Now, you know. I am doing what I think I have to do."

The portions of the tape quoted could be interpreted as an acknowledgment by Robert that he knew of a pending divorce proceeding in Nevada, and Dao testified that she had advised him of her filing for divorce. Robert, on the other hand, testified that he had no knowledge that there was a divorce filed in the State of Nevada and he submitted an affidavit to the court which stated that he had no knowledge, information or reason to believe that any suit for divorce had been begun; he admitted that during conversations with Dao she had mentioned divorce, but Robert thought he would be notified through proper legal channels if she filed.

The Nevada court entered a divorce decree on August 16, 1978, which provided for custody of the son to Dao. Thereafter, Dao made a number of efforts to locate the boy. One such effort was the filing of a habeas corpus proceeding in California, naming Robert's mother as a respondent. That habeas corpus proceeding was unsuccessful because Robert and the boy had already left the State of California. Still later Dao sent a series of letters and gifts to the boy, addressed in care of Robert's brother in Ohio. Those letters and gifts were never returned; but neither were any of them acknowledged. Dao testified that she hired lawyers and investigators to try to find her son and that in those efforts she expended approximately $18,000.

Dao did finally ascertain the whereabouts of Robert and the son in the spring of 1982. Thereupon she filed on June 11, 1982, a petition in the Circuit Court of Lafayette County, Missouri, for the registration of the Nevada divorce decree. She also filed a petition for habeas corpus, and the child was taken into the custody of the juvenile authorities pending determination of the

case. Robert filed a motion to quash the petition for registration of the Nevada decree, and he also filed an independent petition for custody of the child.

A hearing was held on July 6, 1982, respecting the petition to register the Nevada decree. On July 7, 1982, the trial court entered an order denying the application to register on the ground "[t]hat the Nevada Judgment dated August 16, 1978 is invalid and not entitled to full faith and credit as to its provisions for child custody and support and its provisions for maintenance for plaintiff inasmuch as it affirmatively appears such decree was based solely on service obtained against defendant by publication and with no personal jurisdiction over defendant or the child, Robert Leonard Dobyns, neither of whom this Court finds was domiciled, resident or present in the State of Nevada when the action was commenced."

Thereafter, on July 20, 1982, Dao filed her answer to Robert's petition for custody and filed a counterclaim for custody. On July 20, a hearing was commenced for determination of custody. Dao objected at the outset that the Missouri court had no jurisdiction to hold an original custody proceeding for the reason that it was bound by the Nevada decree and Missouri was an improper forum. That objection was taken under advisement, and the court proceeded to receive extensive evidence on the issue of custody. After hearing the evidence, the court entered its judgment awarding custody to Robert, with an allowance of visitation rights to Dao.

## I.

### Effect of the Nevada Decree

Dao contends here as she did in the trial court that a Missouri court has no jurisdiction in this case to hold an original custody hearing but rather is required instead to defer to and enforce the Nevada decree. The trial court refused to give that effect to the custody provision of the Nevada decree on the theory that decree was entered solely pursuant to notice by publication and therefore the Nevada court was without any in personam jurisdiction over Robert.

The decision in *May v. Anderson,* 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953) supports the trial court at least to the extent that it holds that full faith and credit need not be extended by a Missouri court to a Nevada custody provision entered solely pursuant to notice by publication. Dao recognizes that *May v. Anderson* so holds, but she argues that the effect of that decision has been superseded by the Uniform Child Custody Jurisdiction Act adopted in Missouri as Sections 452.440 to 452.550. (All sectional references in this opinion are to RSMo 1978 unless otherwise noted).

In support of that contention, Dao argues that *May v. Anderson* holds only that one state need not give constitutional full faith and credit to a custody decree rendered in another state on service by publication, but does not hold that the custody decree so entered violates due process of law. That was the view of Justice Frankfurter concurring in *May v. Anderson,* and that interpretation of *May v. Anderson* has since received considerable scholarly discussion. Coombs, *Interstate Child Custody: Jurisdiction, Recognition, and Enforcement,* 66 Minn.L.Rev. 711, 736–37 (1982); Comment, *Full Faith and Credit to Child Custody Awards,* 5 Kan.L.Rev. 77, 79–82 (1956); Note, *Ford v. Ford: Full Faith and Credit to Child Custody Decrees?,* 73 Yale L.J. 134, 135 (1963). Under this view, a second state may, although it is not required to, give effect to the child custody decree of the first state even though based solely on service by publication. Dao further argues that Missouri policy is to so recognize custody decrees pursuant to publication under proper circumstances, as evidenced by Section 452.460–1(4).

■ We need not and do not reach the above issue argued by Dao. Accepting for the sake of argument the entire argument by Dao outlined above, nevertheless Missouri had no obligation to recognize the Nevada custody decree under the UCCJA for a reason different from that given by the trial court. If the trial court reached the

correct result, it makes no difference whether the reason assigned by the trial court was or was not correct. *Lawson v. St. Louis-San Francisco Ry. Co.,* 629 S.W.2d 648 (Mo.App.1982); *Duncan v. Reorganized School Dist. No. R-1,* 617 S.W.2d 571 (Mo. App.1981).

Contrary to Dao's argument, the UCCJA does not require recognition in Missouri of the Nevada decree. This can be demonstrated by a consideration of the provisions of that Act. Section 452.500 provides: "The courts of this state shall recognize and enforce an initial ... decree of a court of another state ... which was made under factual circumstances meeting the jurisdictional standards of sections 452.400 to 452.550...." The jurisdictional standards so referred to are specified in Section 452.450-1, which sets forth four bases for jurisdiction to determine child custody. The only one of those bases which could be applicable to the 1978 Nevada decree, and the only basis urged in this case by Dao to support that decree, is 452.450-1(1)(a) which gives jurisdiction to the "home state" of the child at the time of the commencement of the proceeding. If Nevada was the home state of the child on May 18, 1978, then Nevada had jurisdiction; but if Nevada was not at that time the home state, then Nevada had no jurisdiction.

The key question therefore turns on the definition of "home state." That definition appears in the UCCJA as follows:

> " 'home state' means the state in which the child immediately preceding the time involved lived with his parents, a parent, or a person acting as parent, for at least 6 consecutive months...."

Section 452.445(4), which undertakes to adopt the UCCJA definition just quoted, reads as follows:

> " 'Home state' means the state in which, immediately preceding the filing of custody proceeding, the child lived

with his parents, a parent, an institution; or a person acting as parent, for at least six consecutive months; or, in the case of a child less than six months old, ...." [1]

It will be noted that the Missouri definition departs slightly from the UCCJA definition, in that the Missouri definition inserts the phrase "an institution" and introduces a semicolon after the latter term. If the Missouri definition is to be accorded a strictly grammatical construction, the requirement that the child live within the state for at least six consecutive months could be understood as applying only to "a person acting as parent." Dao apparently does so construe the Missouri statute, for her argument proceeds *from that assumption.*

Cogent reason appears, however, for rejecting that construction. The purpose of the six consecutive month provision in question is to discourage child snatching from one state to another by one of the parents and then going into the courts of the new state to obtain a custody decree. This underlying purpose is lucidly stated in Krauskopf, *Child Custody Jurisdiction Under the UCCJA,* 34 J.Mo.Bar 383, l.c. 385 (1978):

> "THE SOLUTION. The Uniform Child Custody Jurisdiction Act [UCCJA], will change the existing law to discourage the kind of 'forum shopping' by noncustodial parents which present laws encourage. The Act specifies exactly what circumstances will give rise to jurisdiction over a child custody proceeding initially, as well as providing for strict recognition of this jurisdiction by other states governed by the UCCJA...."

*Establishing Initial Jurisdiction.* There are four bases of subject matter jurisdiction under UCCJA Sec. 3. The major basis is the 'home state' provision which allows only a court of the child's 'home state' to assume jurisdiction in custody

1. The UCCJA was enacted in Missouri by House Bill No. 914. That bill as truly agreed and finally passed contains a definition of "home state" which differs slightly from Section 452.445(4) as it now appears in RSMo 1978. The bill as passed provides: " 'Home

state' means the state in which, immediately preceding the filing of custody proceeding, the child lived with his parents, a parent, an institution; or a person acting as parent, for at least six consecutive months or, in the case of a child less than six months old, ...."

proceedings. 'Home state' is defined as 'the state in which the child immediately preceding the filing of a custody proceeding lived with his parents, a parent, or a person acting as a parent, for at least six consecutive months, and in the case of a child less than six-months old the state in which the child lived from birth with any of the persons mentioned.' The home state has continuing jurisdiction for at least six months after the child departs. It is considered to be a proper forum because it is in a good position to 'gather' evidence and to have 'continuity of control.' The effect of these provisions in most instances will be to preclude any court action to determine custody in the state of Missouri unless the child has lived here six months, *i.e.* we would not be a haven for child snatchers from other jurisdictions...."

The six month provision in the definition of "home state" is complemented by the six month provision contained in Section 452.-450–1(1)(b) which provides that the jurisdiction of a home state continues for six months even though the child may be absent from the state for any reason, provided that one of the parents continues to live in the home state. The purpose of the two six month provisions taken in conjunction is to preserve exclusive jurisdiction in the original home state and to preclude any jurisdiction in any other state to which the child may be transported, for a minimum period of six months.

To interpret the definition of "home state" as suggested by Dao would frustrate a fundamental and highly desirable feature of the UCCJA. The only reasonable conclusion is that the Missouri legislature intended to reach the same result as that provided by the UCCJA and that the change in punctuation was inadvertent. This conclusion also has the virtue of preventing an inconsistency between the Missour definition and that which appears in the Federal Parental Kidnapping Prevention Act of 1980, 28 U.S.C.A. Section 1738A(b)(4), which is binding upon Missouri as well as every other state of the union. It is to be noticed that the definition of "home state" in the Federal Act is essentially the same as that in the UCCJA. *See also Timmings v. Timmings,* 628 S.W.2d 724 (Mo.App.1982) which treats the definition of "home state" in the Missouri statute as being identical in fundamental effect to that of the UCCJA.

Based upon the foregoing interpretation, Nevada was not the home state of this child at the commencement of the Nevada divorce proceeding. The child, together with the parents, came into the State of Nevada on March 14, 1978. The Nevada divorce proceeding was commenced May 18, 1978, some two months later. The child had not lived in the State of Nevada for six months preceding the filing of the divorce suit and therefore the Nevada decree was not rendered under circumstances meeting the requirements of the UCCJA and the Missouri statute which adopted that uniform act. Therefore the trial court was not obligated to give any effect to the custody provisions of the Nevada decree.

## II.

### *Continuing Jurisdiction of Nevada Court*

Dao argues that Nevada has continuing jurisdiction over the child which precludes any jurisdiction by the Missouri courts. In this connection she relies on Section 452.505 which provides: "If a court of another state has made a custody decree, a court of this state shall not modify that decree unless it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites...." She also cites a parallel provision in 28 U.S.C.A. Section 1738A(f)(2).

The simple answer to this contention is that the trial court did not purport to "modify" the Nevada decree. Rather, the trial court held the Nevada decree void, and the present proceeding in the trial court was for an *original* custody award. The statutory provisions limiting jurisdiction by a second state to *modify* the decree of another state is simply not involved in the present case.

## III.

### Clean Hands

 Dao further contends that the trial court should have declined to exercise jurisdiction under the "clean hands" provisions of the UCCJA. Those provisions contained in Section 452.475 are as follows:

"1. If the petition for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct, the court may decline to exercise jurisdiction if this is just and proper under the circumstances.

2. Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody, has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody. If the petitioner has violated any other provision of a custody decree of another state, the court may decline to exercise is [sic] jurisdiction if this is just and proper under the circumstances.

. . ."

Dao erroneously relies in her argument on the provisions of subparagraph 2 quoted above. That subsection applies only to the *modification* of a decree from another court. As already discussed under point II of this opinion, there was no modification here of the Nevada decree. Therefore, subsection 2 of the statute has no application.

Subsection 1 does apply, but under that subsection the trial court is accorded a broad discretion. Assuming, without deciding, that the acts of Robert in this case constituted a concealment of his son or other "reprehensible conduct," nevertheless the trial court had good reason to exercise its discretion in favor of taking jurisdiction.

In the first place, the matter came before the court not solely upon the petition of Robert for custody, but also pursuant to the counterclaim of Dao for custody. In other words, both parties were asking for a custo-dy determination. It was hardly an abuse of discretion for the court to proceed with a determination when that was requested by both parties to the proceeding.

Even more important, if the trial court had declined to exercise jurisdiction, then there would have been no court anywhere with authority to adjudicate the custody of this young boy. If Nevada did not have jurisdiction in 1978, and this opinion holds that it did not, then certainly it had no jurisdiction in 1982. So if a Missouri court did not take jurisdiction of this matter, then the parties would have been left to self help, which would have been the worst possible result. The trial court here most certainly committed no abuse of discretion in exercising jurisdiction.

Affirmed.

All concur.